[Cite as *In re N.N.*, 2023-Ohio-3136.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| N.N. AND I.N. | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Andrew J. King, J. |
| | : | |
| | : | Case Nos. 23 CAF 02 0011 |
| | : | 23 CAF 02 0012 |
| | : | 23 CAF 02 0013 |
| | : | 23 CAF 02 0014 |
| | : | 23 CAF 02 0015 |
| | : | 23 CAF 02 0016 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Court of Common Pleas, Juvenile Division, Case Nos. 21-01-0011AB & 21-01-0012AB

JUDGMENT:                                        Affirmed

DATE OF JUDGMENT:                        September 5, 2023

APPEARANCES:

For Appellant Father                            For Appellee Agency

ALEX J. POMERANTS                          NICOLE L. THORNTON
2734 East Main Street                          145 North Union Street, 2nd Floor
Columbus, OH  43209                          Delaware, OH  43015

For Appellant Mother                           For Children

WILLIAM T. CRAMER                          CAROLYNN E. FITTRO
470 Olde Worthington Road, Suite 200    1335 Dublin Road, Unit 115F
Westerville, OH  43082                         Columbus, OH  43215

For Appellants S.B. and G.C.                 For CASA

PORTER R. WELCH                             SHANNON K. RUST
21 Middle Street, P.O. Box 125              128 South Main Street
Galena, OH  43021                             Marysville, OH  43040

JEFFREY W. SHARP                           Guardian ad Litem
21 Middle Street, P.O. Box 248
Galena, OH  43021                             HILLARY SANTIAGO-BURGOS
                                                    P.O. Box 491
                                                    Columbus, OH  43216

*King, J.*

{¶ 1}   Appellants, father M.N., mother N.C., and maternal grandparents S.B. and G.C., appeal the January 9, 2023 judgment entries of the Court of Common Pleas of Delaware County, Ohio, Juvenile Division, denying the grandparents' motions for legal custody and granting permanent custody of two children to appellee, the Delaware County Department of Job and Family Services ("agency").  We affirm the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   These cases involve two children, I.N. born August 2016 and N.N. born September 2020.  Mother of the children is N.C.; father is M.N.  Maternal grandmother is S.B. and maternal grandfather is G.C.; they are divorced.  Pursuant to initial complaints filed by agency on October 19, 2020, the children were placed in S.B.'s temporary custody with protective supervision to agency.   The agency was concerned with mother's substance abuse and father's domestic violence against mother.   During most of the proceedings, father was incarcerated.

{¶ 3}   On January 13, 2021, agency refiled complaints alleging the children to be abused, neglected, and/or dependent.  An adjudication hearing was held on March 3, 2021; the children were found to be dependent and were ordered to remain in S.B.'s care. On April 7, 2021, the children were removed from S.B.'s care after an incident wherein agency could not locate the children and they were found by the Massillon Police Department with mother and father; emergency temporary custody was granted to agency.  A dispositional hearing was held on April 8, 2021; temporary custody was continued with agency.

{¶ 4}   On April 21, 2022, agency filed motions for permanent custody of the children.  On April 26, 2022, S.B. filed motions for legal custody and motions to intervene. On July 6, 2022, G.C. filed motions to intervene which were treated as motions for legal custody.

{¶ 5}   Hearings were held on October 3, 17, 21, and November 19, 2022.  By judgment entries filed January 9, 2023, the trial court denied grandparents' motions for legal custody and granted agency permanent custody of the children.

{¶ 6}   Appellants filed appeals and this matter is now before this court for consideration.  Father's assignment of error in each appeal is as follows (Case Nos. 23 CAF 02 0011 and 23 CAF 02 0012):

## FATHER I

{¶ 7}   "THE JUDGMENT OF THE TRIAL COURT GRANTING THE MOTION FOR PERMANENT CUSTODY AND DENYING THE MOTIONS FOR LEGAL CUSTODY WAS AN ABUSE OF DISCRETION BY THE COURT."

{¶ 8}   Grandparents' assignments of error in each appeal are as follows (Case Nos. 23 CAF 02 0013 and 23 CAF 02 0014):

## GRANDPARENTS I

{¶ 9}   "THE JUDGMENT OF THE TRIAL COURT DENYING LEGAL CUSTODY TO THE APPELLANTS IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

## GRANDPARENTS II

{¶ 10} "THE TRIAL COURT ERRED IN DENYING APPELLANTS' MOTIONS FOR LEGAL CUSTODY BECAUSE DCDJFS FAILED TO PERFORM INTENSIVE EFFORTS TO IDENTIFY AND ENGAGE A WILLING KINSHIP CAREGIVER."

## GRANDPARENTS III

{¶ 11} "THE TRIAL COURT ABUSED ITS DISCRETION BY NOT CONSIDERING THE WISHES OF THE CHILD AS REQUIRED BY R.C. §2151.414(D)(1)(b)."

{¶ 12} Mother's assignment of error in each appeal is as follows (Case Nos. 23 CAF 02 0015 and 23 CAF 02 0016):

## MOTHER I

{¶ 13} "THE JUDGMENT OF THE TRIAL COURT DENYING LEGAL CUSTODY TO APPELLANTS S.B. AND G.C. IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## MOTHER II

{¶ 14} "THE TRIAL COURT ERRED IN DENYING THE MOTIONS FOR LEGAL CUSTODY OF APPELLANTS S.B. AND G.C. BECAUSE DCDJFS FAILED TO PERFORM INTENSIVE EFFORTS TO IDENTIFY AND ENGAGE A WILLING KINSHIP CAREGIVER."

{¶ 15} Because all of these assignments of error are interrelated, they will be addressed collectively.

{¶ 16} In its January 9, 2023 judgment entries, the trial court found by clear and convincing evidence the children have been in agency's custody for twelve or more months out of a twenty-two-month period, satisfying the requirement for permanent

custody under R.C. 2151.414(B)(1)(d).  Appellants do not contest this finding; they all challenge the trial court's denial of the maternal grandparents' motions for legal custody.

{¶ 17} R.C. 2151.353 governs disposition of abused, neglected, or dependent child and states in pertinent part:

(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

(3) Award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings.

(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child.

{¶ 18} Pursuant to R.C. 2151.4116(A), "[a] public children services agency or private child placing agency shall make intensive efforts to identify and engage an

appropriate and willing kinship caregiver for the care of a child who is in * * * [the]

[t]emporary custody of the agency."

{¶ 19} In *In re D.T.,* 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-

4818, ¶ 20-22, our colleagues from the Eighth District explained the following:

Unlike permanent custody cases in which the trial court is guided by

the factors outlined in R.C. 2151.414(D) before terminating parental rights

and granting permanent custody, R.C. 2151.353(A)(3) does not provide

factors the court should consider in determining the child's best interest in

a motion for legal custody. *In re G.M.* [8th Dist. Cuyahoga No. 95410, 2011-

Ohio-4090] at ¶ 15. We must presume that, in the absence of best interest

factors in a legal custody case, "the legislature did not intend to require the

consideration of certain factors as a predicate for granting legal custody."

*Id.* at ¶ 16. Such factors, however, are instructive when making a

determination as to the child's best interest. *In re E.A.* [8th Dist. Cuyahoga

No. 99065, 2013-Ohio-1193] at ¶ 13.

The best interest factors include, for example, the interaction of the

child with the child's parents, relatives, and caregivers; the custodial history

of the child; the child's need for a legally secure permanent placement; and

whether a parent has continuously and repeatedly failed to substantially

remedy the conditions causing the child to be placed outside the child's

home. R.C. 2151.414(D).

Because custody determinations " 'are some of the most difficult and agonizing decisions a trial judge must make,' " a trial judge must have broad discretion in considering all of the evidence. *In re E.A.* at ¶ 10, quoting *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). We therefore review a trial court's determination of legal custody for an abuse of discretion. *Miller v. Miller,* 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 20} In addition to the best interest factors set forth in R.C. 2151.414(D), trial courts determining legal custody motions have also looked to the overlapping best interest factors found in R.C. 3109.04(F)(1) for guidance. *In re G.B.,* 5th Dist. Richland No. 2023 CA 0006, 2023-Ohio-3024, ¶ 38; *In re A.K.,* 9th Dist. Summit No. 26291, 2012-Ohio-4430, ¶ 25 ("Although it is agreed that the 'best interest' of the children will control, courts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be considered regarding the best interests of the children").

{¶ 21} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base its judgment. *Cross Truck Equipment Co., Inc. v. The Joseph A. Jeffries Co.*, 5th Dist. Stark No. CA5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible

evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶ 22} During the hearings, the trial court heard from nine witnesses. Both mother and father supported grandparents' motions for legal custody. November 19, 2022 T. at 131, 136. Although mother's ability to parent is not an issue in these appeals, it is relevant to understanding agency's concerns with S.B.'s protective capacity.

{¶ 23} Jordan Emmons, the family's caseworker from October 2020 to July 2022, testified the initial concerns were substance abuse as N.N. was born positive for Oxycodone, and domestic violence between mother and father. October 3, 2022 T. at 13, 14-15, 100-101. Under the case plan, mother was to participate in drug and mental health treatment, but was unsuccessful. *Id.* at 27, 28, 53-54. Mother was living off-and-on with maternal grandmother, S.B. S.B. had temporary custody of the children with protective supervision to agency. On or about April 6, 2021, Emmons attempted to locate the children and was unable to make contact with S.B. *Id.* at 36-37, 97-98. There were concerns the children were having unsupervised visitations with mother and father against court orders. *Id.* at 18-19, 110-111. Mother called Emmons and told him the children were with her friend which Emmons confirmed. *Id.* at 37. The next day, on April 7, 2021, agency received emergency custody of the children and Emmons attempted to locate the children. *Id.* at 20, 83. When Emmons spoke to S.B., she did not know where the children were. *Id.* at 87. After a run-around by mother, the children were found with the assistance of the Massillon Police Department. *Id.* at 34-35, 84-88. The police found

the children in a vehicle that was being packed by mother and father. *Id.* at 88. The children were then placed in foster care. *Id.* at 36, 56.

{¶ 24} Emmons observed visitations between the children and S.B.; the visitations went well and they were bonded with each other. *Id.* at 49-50, 94. S.B. was able to have two unsupervised visits with the children over the holidays. *Id.* at 50. Mother may have been present for one; father was not as he was incarcerated. *Id.* at 50-51. Additional unsupervised visits with S.B. were considered, but were denied because there were concerns she would permit the parents to join in. *Id.* at 51. During a visitation, Emmons heard S.B. allude to "if she were to be given custody of the children, that they would bide their time to then return custody back to" mother and father with the intention to "bypass" agency's recommendations for permanent custody. *Id.* at 51-52, 92-93, 106-109. Mother continued to live off-and-on with S.B. and have substance abuse issues; S.B. was told if she wanted to pursue legal custody, mother would have to live elsewhere. *Id.* at 52-54, 113-114. As deadlines approached to file for permanent custody, circumstances did not change "despite our efforts to try and encourage otherwise." *Id.* at 114. Agency was concerned about S.B.'s "ability to draw a line in the sand" for mother. *Id.* at 113, 115. Emmons was concerned with S.B.'s protective capacity of the children (*Id.* at 79-80):

> Leading up to the events that resulted in the girls coming into our custody and later on, and that was April of '21, we'd had numerous concerns of potential supervision issues that were occurring and also issues with accessibility to the girls. With us having protective supervision, we need to be able to observe them. And if we can't get ahold of their caregiver and

be able to locate where they're at in a timely manner, that becomes very difficult for us to ensure their safety.

{¶ 25} Emmons acknowledged between April 2021 and July 2022, S.B. did three things asked of her: 1) retire so she could be present with the children, 2) remove mother from her home, and 3) reduce unsupervised visits with mother and father. *Id.* at 125-129.

{¶ 26} Emmons explored paternal kinship placement. *Id.* at 61. Either the individuals contacted were not interested or did not respond. *Id.* at 61-64. The children were in agency's custody for over twelve months. *Id.* at 65. Father was removed from the case plan in August 2021 because he was incarcerated for seven years. *Id.* at 21, 24, 70-71.

{¶ 27} Kylie Bryant, a social services worker for agency, testified she supervised family visitations since May 2021 and for the most part, they had gone really well; however, there were concerns that mother made promises to the children she could not keep, discussed adult subjects with the older child, attempted to alter her drug screens, told the older child she would cut off the fingers of the foster mother if the child referred to the foster mother as "mom" again, and made comments about a gun. *Id.* at 152-153, 155-158, 229-231, 260. S.B. was consistent with her visitations and the visits went well. *Id.* at 160. The children had a strong bond with S.B. *Id.* At times, S.B. and mother would discuss the case plan in front of the children which sometimes resulted in bickering about mother's progress. *Id.* at 160-161, 230. A recorded jail telephone call between mother and S.B. was played. *Id.* at 168-204. A lot of the conversation was about how much the two hated "Diane"; S.B. stated "[w]e'll send one of [M.]'s people up there to take care of

her."  *Id.* at 203.  S.B. also stated if she got her hands on the oldest child, she would tell the child "Diane" was "not her friend."  *Id.* at 199.

{¶ 28}  Diane Nelson, the CASA volunteer child advocate, testified she had ongoing concerns with mother's continued substance abuse, mental health issues, and potential domestic violence.  *Id.* at 285-286, 353-356, 363.  Nelson stated the children were bonded to mother and S.B. and S.B.'s home was well kept and the children's needs were being met; the foster home was very safe and the children were provided for.  *Id.* at 275-276, 279-280, 286-287, 323.  Nelson opined the children's placement with S.B. would not be appropriate because S.B. would not protect the children from mother; from past history, S.B. has chosen the presence of mother over the children's protection.  *Id.* at 297-298, 318-319, 329.  Nelson was concerned if S.B. was to obtain custody, she would turn the custody over to mother; Nelson was concerned S.B. would not follow court orders.  *Id.* at 341-342.  She had no concerns with S.B. caring for the children other than her ability to protect the children from mother.  *Id.* at 342, 356, 364-365.  The current foster placement was not a foster-to-adopt placement.  *Id.* at 366.

{¶ 29}  Sherry Ward, the ongoing case supervisor, testified S.B.'s interactions with the children were appropriate and she was capable of meeting their needs.  October 17, 2022 T. at 18-19, 34.  However, S.B. was denied additional unsupervised visits because of concerns S.B. permitted mother to have access to the children, discussed improper topics during visitations, turned off the speakerphone when the children were on the phone speaking with mother, and mother's ongoing substance abuse and her living with S.B.  *Id.* at 14-17, 28-31.  Agency's concern was that S.B. would not prioritize the children over mother.  *Id.* at 30-31.  S.B. enabled mother's behavior, engaged in the inappropriate

jail telephone call with mother, made threats, and alluded to getting custody of the children and giving them to mother and/or father; there were concerns over whether she would protect the children. *Id.* at 78-80.

{¶ 30} Ward spoke with G.C. who lived in Michigan. She explained the Interstate Compact for the Placement of Children process. *Id.* at 20. G.C. indicated he was not sure about custody of the children given his advanced age, being single, and the children's young ages. *Id.* at 21. G.C. did not go through with the interstate process because he was contemplating moving to Ohio and moving into his own place or moving in with S.B. in Columbus. *Id.* at 22. Agency did not have an approved interstate application or an approved home study for G.C. in Ohio even though he was offered both. *Id.* at 23. Ward stated she cannot make anybody go through the interstate process or a home study, she can only offer to complete them and G.C. "has not engaged back." *Id.* at 77.

{¶ 31} Hillary Santiago-Burgos, the guardian ad litem, testified the visitations she observed between the children and mother, S.B., and G.C. went well and were positive. *Id.* at 133-134. She conducted a visit of S.B.'s home in August 2022 and although she was told mother was no longer living there, all of mother's belongings and clothes were still in a bedroom. *Id.* at 137, 193. The guardian did not have any concerns with S.B.'s or G.C.'s interactions with the children. *Id.* at 185-186. However, the guardian recommended permanent custody to the agency because she did not believe S.B. would be able to protect the children from mother; S.B. had made threats to people who were trying to help and she admitted she had enabled mother. *Id.* at 141-144, 193. The guardian did not believe court orders relative to who the children could have contact with

and where they could be would be sufficient to protect the children "because we've already had Orders in place and from my perspective, they were violated." *Id.* at 204. The guardian opined "the family is working to get to their end goal, which is have the children, but not necessarily thinking about the children in terms of their safety." *Id.* at 208.  She admitted the children were very bonded with S.B. and terminating the relationship would be traumatic, and the foster home was not an adoptive home so permanent custody would also terminate those relationships; but the guardian took all of that into consideration and balanced it against the potential for further intervention if the children were returned. *Id.* at 152-153, 161-163.

{¶ 32} Maternal grandfather G.C., age 66, testified he lived in Michigan, but was willing to relocate to raise the children with S.B.  October 21, 2022 T. at 8, 15-16, 24.  He did not think it was in the children's best interest for him to raise the children by himself. *Id.* at 15-16.  He agreed the children should not be returned to mother and he and S.B. would only permit mother to visit if they could verify that she was getting treatment and staying clean. *Id.* at 27-30, 49-50, 57-58, 76.  After investing all their efforts into getting legal custody, G.C. would not allow mother or father to jeopardize it. *Id.* at 42, 115.  He would abide by any court orders. *Id.* at 107.  His plan was to sell his home in Michigan and cohabitate with S.B. and the children in Ohio. *Id.* at 46.

{¶ 33} S.B., age 64, testified since the births of the two children, she has been involved in the children's lives ninety percent of the time.  November 19, 2022 T. at 11-12.  S.B. explained mother lived with her off-and-on and never totally moved out, but was not in her home most of the time. *Id.* at 9-10.  Mother finally moved out when she went to sober living. *Id.* at 10.  S.B. changed the locks on her home so mother could not enter;

she has a security system and mother does not know the code. *Id.* at 10, 91. When asked if she had concerns about mother coming into the home, S.B. stated if G.C. was there, no, if the children were there with her, then yes. *Id.* at 91.

{¶ 34} S.B. explained as for the April 2021 incident, she did not respond to Emmons because she was at work and not permitted to have her cellphone. *Id.* at 14-15. She noticed Emmons had sent her some texts and asked mother about it when mother called on S.B.'s work phone; mother told her not to worry, she had spoken to Emmons and everything was fine. *Id.* at 15-16. It was S.B.'s understanding that mother needed supervision to visit with the children, but she herself did not have to be the supervisor every time; she thought mother was being supervised by a friend. *Id.* at 16, 18.

{¶ 35} In May of 2021, S.B. permitted father to reside at her house with mother even though he had been involved in a domestic violence incident with mother. *Id.* at 25. When mother was pregnant with the youngest child, father "mashed her mouth" and damaged her teeth. *Id.* at 74-75. Yet S.B. was glad to have father at her house to "keep an eye on" mother because she was not getting out of bed or talking on the phone, "she wasn't herself at that point." *Id.* at 26, 77. Mother was taking "some meds because she'd been through a lot with the domestic violence" and was having trouble sleeping so the agreement was for father to stay at the house and keep an eye on her "until he went to jail." *Id.* at 77. S.B. invited mother's abuser into her home.

{¶ 36} After the children were removed from S.B.'s care, S.B. attended all her weekly visitations without any problems. *Id.* at 19-20. She stopped working in September 2021 so she could maintain her visitation with the children. *Id.* at 20-21, 62-63. She was

aware of mother's substance abuse problem and acknowledged mother would probably spend her entire life dealing with it, but she was working very hard and had come a long way. *Id.* at 24-25. S.B. explained the statements she made during her jail telephone call with mother were made in frustration and she was upset because Nelson, the CASA volunteer child advocate, really let her down by stating the older child wanted to stay with the foster family. *Id.* at 39, 41-42. Her statement about sending one of [M.]'s people to "take care of her" was an attempt to "console" mother, telling her not to worry, "we'll get through this." *Id.* at 42-43. She was not alluding to "bypass" the system, she was just trying to give mother "a little bit of hope" that she could see the children again "down the road," but it would be through the court. *Id.* at 46-47. S.B. stated if granted legal custody of the children, she would abide by all court orders, including any orders that prohibited or limited contact with mother and father. *Id.* at 43-44. She would take the children to therapy if needed and would protect the children from mother and father by being with the children at all times. *Id.* at 43-45. S.B. and the children were "very much" bonded. *Id.* at 49. S.B. expressed the ideal arrangement would be joint legal custody of the children with G.C. *Id.* at 51.

{¶ 37} In its January 9, 2023 judgment entries denying grandparents' motions for legal custody, the trial court noted G.C. did not have a residence in Ohio and based on his own admissions and statements, legal custody to him would not be in the children's best interest. The crux of the matter was legal custody to S.B. The trial court acknowledged where a grandparent is available and willing to care for the children, the court "will seek to avoid a permanent custody order." January 9, 2023 Judgment Entry at Conclusion of Law No. 16. However, the trial court noted this was not the normal case

of legal custody to a grandparent.  While the trial court was concerned with the threat

made by S.B. during the jail telephone call, the trial court was more concerned with S.B.'s

statement that an order of custody to her "would be a pretext" to her returning the children

to mother.  *Id.* at Conclusion of Law No. 17.  The trial court explained (*Id.*):

> When combined with the troubling incident on April 7, 2021, in which
> multiple witnesses testified that Ms. [B.] either provided incomplete or
> inaccurate information about the whereabouts of the children, and that she
> seemed unconcerned about their location or where their parents were
> taking them, the unavoidable conclusion that must be reached is that a
> placement of the children in the legal custody of Ms. [B.] would be
> tantamount to returning them to the custody of Mother, an action that the
> Court has already determined would be significantly to their detriment.  The
> substantial time elapsed between these two incidents--over twelve months-
> -indicates that even the severe consequences of the April 7, 2021 incident
> did not persuade Ms. [B.] to more faithfully abide by the orders of this Court.

{¶ 38} The trial court recognized S.B. may have changed, "but evidence in support

of such a conclusion is far outweighed by evidence supporting the concern of an ulterior

motive."  *Id.*  The trial court weighed the best interest standards and found permanent

custody to agency was in the children's best interest.

{¶ 39} We note in response to grandparents' Assignment of Error III, the trial court

noted the conflicting testimony on the oldest child's wishes and that it conducted an in

camera interview with the child.  Findings Nos. 77, 121, 162, Conclusion of Law No. 5. The trial court also heard the closing summary of the child's attorney advocate expressing the child's wishes.  November 19, 2022 T. at 131.  The trial court heard and considered the wishes of the child, but was not obligated to mention "how this factor specifically informs the trial court's decision."  Appellants' Brief at 16.

{¶ 40} As for arguments about intensive efforts for kinship placement under R.C. 2151.4116(A), any individuals contacted by the agency were either not interested or did not respond.  Although G.C. was not initially contacted, he became involved in the case and had enough time to start the interstate process or participate in a home study if he had chosen to do so.

{¶ 41} Before the trial court were two motions, one for legal custody to S.B. and/or G.C. and one for permanent custody to agency.  Both motions required the consideration of the children's best interest.  We note a trial court "is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody."  *Matter of J.C.,* 5th Dist. Tuscarawas Nos. 2022 AP 11 0044 - 2022 AP 11 0049, 2023-Ohio-1263, ¶ 34.  (Citations omitted.)

{¶ 42} G.C. called to inquire about legal custody, but did not follow through with the interstate process or have any kind of home study done in Ohio as he did not have a home in Ohio.  He was not in favor of legal custody by himself; his plan was to live with or near S.B. and share custody.  Although S.B. understood mother could only visit the children with supervision, S.B. permitted unsupervised visitations.  Although now she has changed the locks on her home, her behavior, from the April 2021 incident to her comments alluding to returning the children to mother, supports the conclusion that she

will not abide by the trial court's orders.  If the trial court awarded legal custody of the children to appellants, mother could be left alone with the children.

{¶ 43} Although both mother and father supported legal custody to grandparents, based upon the evidence presented, that placement was not in the best interest of the children.  It was reasonable for the trial court to conclude the children would be best served with permanent custody to agency.

{¶ 44} Upon review, we find the trial court did not err in denying grandparents' motions for legal custody.  We do not find a manifest miscarriage of justice.

{¶ 45} All the assignments of error are denied.

{¶ 46} The judgments of the Court of Common Pleas of Delaware County, Ohio, Juvenile Division, are hereby affirmed.

By King, J.

Gwin, P.J. and

Delaney, J. concur.